## TURNIPSEED v. GOODWIN, ET ALS.

1. The profits of a partnership are to be divided equally, unless there is a contrary stipulation, or unless some fact or circumstance exists, from which it may be inferred, the parties intended the profits should be divided, in certain unequal portions.

2. A partnership being formed for the purpose of buying and selling lands, each partner to furnish an equal share of money, if one should refuse to make the necessary advances, it would be good cause for putting an end to the partnership, but as long as the partnership subsisted, a larger advance by one partner, than it was his duty to make, would be compensated by allowing him interest on such excess.

3. A private memorandum book kept by one of the partners, who was treasurer of the company, and to which the other partners did not have access, is not evidence for the party keeping it.

4. An allegation in a bill filed by one partner, against the rest, for a settlement of the partnership accounts, that an agreement had been entered into between himself and another partner, to invest a portion of the partnership funds in a tract of land, sell and divide the profits, if intended to call on that partner for a division of the profits of that particular speculation, would render the bill multifarious. It cannot be objected therefore, by the complainant, that the Chancellor, by a liberal interpretation, and to avoid the charge of multifariousness, considered the allegation as introduced for the purpose of calling on the partner to account for so much of the partnership funds paid him.

Error to the Chancery Court at Talladega.

THE bill was filed by the plaintiff in error, for the settlement of a partnership in lands against Christopher A. Green, John and Thomas Goodwin, and the heirs and representa-

tives of Samuel F. Clawson, deceased. The allegations of the bill are, that the object of the partnership was to buy, and sell Indian reservations, and divide the profits. That complainant, Green, and Clawson, were to furnish the mo · ney, and J. and T. Goodwin were to make the contracts with the Indians, and bring them before the certifying agent. That the lands were to be sold, and after the purchase money was refunded, the profits were to be divided equally, between the complainant, Clawson and Green of the one part, and J. and T. Goodwin of the other part, as will appear by an instrument under the seal of the parties, a copy of which is appended to the bill, as follows:

"Articles of agreement entered into between Andrew Turnipseed, Samuel F. Clawson, and C. A. Green of the one part, and T. and J. Goodwin of the other part, witnesseth, that we have agreed to purchase Indian reservations, in copartnership, from the Creek tribe of Indians, in the State aforesaid; Turnipseed, Clawson and Green, for their part, are to furnish the money to pay for the reservations bought from the Indians—T. and J. Goodwin are to make contracts with the Indians, bring them before the certifying agent, and to have the contracts certified, by Turnipseed, Clawson and Green furnishing the money to pay said Indians for their reservations of land, and all the lands so bought, are to be sold by the company, and when sold, the purchase money is to be paid back to Turnipseed, Clawson and Green, and the profits to be divided in the following manner, to wit: one half to Turnipseed, Clawson and Green, and the other half to T. and J. Goodwin. The reasonable interpreter's fees to be paid out of the profits."

This instrument is dated the 10th October, 1834, and is signed and sealed by all the parties. `

The complainant charges, that the money to purchase the reservations was principally furnished by himself. That in reference to some land, situate on or near the Tallapoosa river, the defendant, Green, considering them unsaleable, gave complainant notice in writing, that he would not advance any money in their purchase, and that Clawson did not advance any, and that both now claim an equal share of these lands, under the contract, contrary to equity and justice.

That Clawson applied to him for the note of one Allen Elston, which was obtained from Elston, by the sale of one of the reservations, which he, Clawson, agreed to invest in the purchase of a tract of land, and divide with complainant the profits, which he accordingly did, and now claims and holds as his own property. Annexed to the bill are tables, showing the amount expended by the complainant, and the amount received by him upon sales of land ; also, the amount received by Green, upon sales made by him. The bill prays a discovery and account, and for general relief, &c.

The complainant filed an amended bill, setting forth the facts stated in the original bill, and that sometime in the year 1834, a parol agreement for the purchase of Indian lands was entered into by the parties, by which J. & T. Goodwin were to receive one fourth of the nett profits. That after the purchase of several reservations, the Goodwins complained of the inadequacy of their compensation, that thereupon the agreement was entered into set forth in the original bill, and on the 23d January, 1835, the parol agreement was reduced to writing by the parties. This is made an exhibit to the bill. It describes the land purchased under the agreement, and concludes that after the purchase money is refunded, " the profits are to be equally divided between Turnipseed, Clawson, Green, John and Thomas Goodwin."

Green answered the bill, and admitted the contracts as stated in the bill. States, that he paid $1120, on account of the partnership, which was all that was required by the complainant, who was the treasurer. Insists on his right to the interest which belongs to him in the Tallapoosa lands, and denies most of the remaining allegations of the bill, and calls for proof.

The administrator of Clawson, denying all personal knowledge of the transaction, answers, and insists upon the evidence of papers in his possession, as to payments made for the purchase of the lands. That as it respects the land purchased with the Elston note, it was bought by the intestate for his own use, denies the verbal agreement set up in the bill, and if it really existed, relies on the statute of frauds as a bar, and demurs to the bill for multifariousness, as well as for want of equity.

The Goodwins also answered the bill, but their answers are not important in this controversy.

The Chancellor refused to dismiss the bill for multifariousness, and considered the allegations of the bill, that the Elston note was to be invested for the joint benefit, or on account of the complainant and Clawson, as merely inserted to require the representatives of Clawson to account for the money as partnership property, and directed a reference to the master to inquire and report—

1. The land purchased under the agreement.

2. The amount of money furnished by each of the parties.

3. The amount of land sold, and for what sum.

4. The land remaining unsold.

5. To make a separate report as to the Tallapoosa land.

6. To state an account between the partners themselves.

The Master made a report, to which many exceptions were taken, most of which were overruled, and the report being amended, pursuant to the order of the Chancellor ascertaining the amount of each of the parties in the funds, a decree was rendered accordingly, from which this writ is prosecuted.

T. D. Clarke, for plaintiffs in error, moved to dismiss the writ of error, because the decree was not final, which being overruled, he made the following points:

1. The Chancellor erred in the construction he put upon the contract of partnership; as the contract was silent as to the share of the profits, the division of the profits should have been regulated by the amounts each put into the common stock.   This is especially true, where money alone is contributed, and whatever may be the rule of law, is certainly the rule in equity.   Even if the Chancellor correctly construed the agreement, the refusal of the other partners to contribute when called on by the complainant, was an abandonment of any further interest in the partnership.   [Story on Part. 30, 31, 34, 35, 43; 2 Camp. 45; 7 Blythe R. 432; 3 Mass. 364; 3 Kent's Com. 28; Gow. on P. 9; Collyer on P. 114; 1 T. & R. 517.

2. The Chancellor erred in the amount allowed to Clawson as an advance.

3. In refusing to permit the books of the complainant, who was the treasurer of the company, to be admitted in evidence. [3 Paige, 566; 1 Monroe, 80.]

4. In depriving the complainant of the benefit of his contract with Clawson, for the purchase of a tract of land.

5. In decreeing to the defendants their proportion of the profits of the Tallapoosa lands, and in decreeing a distribution of the lands purchased, during the suspension of the parol agreement.

W. P. CHILTON and F. W. BOWDON, contra. In the absence of any special agreement, as to the division of the profits, the law is clearly settled, at least in this country, that it is to be equally divided among the partners. [Story on P. 30; Watson on P. 59, 60; Collyer on P. 105; 3 Kent's Com. 28; 6 Wend. 263; 16 Vesey, 49.]

There is no proof in the record, that the defendants refused to advance, but if there was, it would not vary the case. [4 Ala. R. 82; Story on P. 327.]

The book kept by the complainant as treasurer, was correctly rejected. It does not appear that the other partners had access to it. In truth it was a mere private memorandum book of the complainant, and could not be evidence for the party making it. [3 Ala. R. 642.]

The Elston note was properly charged as part of the profits.

ORMOND, J.—What is the interest of the respective partners in the partnership funds, in the absence of any contract ascertaining the shares of each? This is a question, about which, in England, there appears to be some diversity of opinion. In Peacock v. Peacock, 2 Camp. 45, which was the case of a father taking his son into partnership, without any stipulation as to his share of the profits, Lord Ellenborough held, that there was no presumption in law, in such a case, that the son was to be entitled to a moiety of the profits, but that it was for the jury to determine what was fair and just between the parties, from what had passed between them. The jury found that the son was entitled to a fourth part.

.This was an issue out of Chancery, and upon its return to that court, Lord Eldon expressed great dissatisfaction with it, and maintained that the son was entitled to a moiety, or nothing ; there being in fact a partnership, and no agreement about the division of profits. [Peacock v. Peacock, 16 Vesey, Jr. 50.] Of the same opinion was Mr. Baron Park, in Farrar v. Beswick, 1 Mood. & Rob. 527. A recent decision of the House of Lords, appears to have shaken, if it has not overthrown the donation of Lord Eldon, and established that of Lord Ellenborough. [Thompson v. Williamson, 7 Bligh, 432.]

In the United States, so far as the question has been considered, the law as laid down by Lord Eldon, appears to be recognized. See 3 Kent's Com. 1 ed. 6 ; Gould v. Gould, 6 Wend. 263, and such it may be added, is the opinion of the English text writers. This doctrine commends itself by its certainty, and simplicity, as it would be extremely difficult, if not impossible, in many cases, to ascertain the precise value to the partnership, of what each party brought into the concern. This would especially be the case, where the money of one partner, was opposed to the skill and experience of another. How can a just estimate be made of matters so vague and indeterminate, as skill, experience, probity, &c.? Juries, and Judges, would determine it differently, and therefore such a rule is wanting in that certainty, and precision, which is essential to the correct administration of justice ; and it appears to us much more reasonable to suppose, that when the parties do not stipulate for the division of the profits, they intend an equal division, than that they should have contemplated some uncertain rule, to be afterwards ascertained. We think, therefore, the rule is, that where there is no contrary stipulation, and no fact or circumstance exists, from which it may be inferred that the parties intended the profits should be divided in certain unequal portions, they will be entitled to equal portions of the profits, and be liable to an equal share of the burdens.

In this case, indeed, there is but very slender ground for the argument which has been made, as the parties have provided for the manner in which the profits shall be divided.

By the first article, " one half to Turnipseed, Clawson and Green, and the other half to T. and J. Goodwin." A subsequent agreement, relating to other lands, declares, that " the profits are to be equally divided between Turnipseed, Clawson, Green, John and Thomas Goodwin." Upon this last agreement, there can be no controversy, that the parties are equally entitled to share in the profits, and as it respects the first, if not quite so definite as the last, it is sufficiently certain. One half the profits are to be divided between Turnipseed, Clawson and Green, and it is very certain, that the parties contemplated an equal division of the half of the profits, because, by the very terms of the contract, these three persons were to furnish the money for the purchase of the lands, and certainly in equal proportions. Such was the complainant's understanding of the contract, as he alledges that he called on the other two, and they refused to furnish their proportion of the money, and such is clearly the legal interpretation of the agreement. A failure or refusal to make the necessary advances, would doubtless have been good cause for putting an end to the partnership, but as long as it subsisted, a larger advance by one partner, than it was his duty to make, would be compensated by allowing him interest on such excess, or it might furnish a cause of action for a breach of the articles of co-partnership. It could not vary the terms of the co-partnership. This was the point decided in Boyd v. Mynatt, 4 Ala R. 79, which is in principle analagous to this case.

We think with the Chancellor, that the proof is not very satisfactory as to the amount advanced by either of the parties, and this remark applies as well to the complainant as to the two others. We can see no reason for disturbing the account in this particular. To authorize parties who have accounted before the Master, to raise objections to the account in this court, the error should be distinctly pointed out. So far as we can judge from the record, the decree is quite as favorable in this respect to him, as he could ask.

The book kept by the complainant of his expenses, disbursements, &c. was certainly not evidence for him, without further proof. It appears to have been a private memorandum book, kept by the complainant, and although he was

treasurer of the company, that does not make the book evidence against the other members. It was his private property, to which the others had not access, and cannot therefore be evidence against them.

It is further objected, that by permitting the note on Elston, which was handed to Clawson to purchase a tract of land, upon an agreement between the complainant and Clawson, to sell and divide the profits, to be taken into the account, the Chancellor has deprived him of the benefit of his contract with Clawson. If this be so, certainly the Chancellor is not to blame. The allegation of the bill is, that the complainant handed to Clawson, a note upon one Allen Elston, for $1100, which was given upon the purchase by Elston of part of the land of the partnership, upon an agreement that Clawson should purchase a tract of land with the note, and sell and divide the profits with him. A motion was made, to dismiss the bill for multifariousness, upon the ground that it united distinct matters, in which all the defendants had not a common interest. This objection should have prevailed, if the design was to obtain from Clawson a discovery as to the land purchased with the Elston note, and to claim for the complainant individually, a share of the profits. The Chancellor, by a liberal interpretation of the bill, considered, that the object of the allegation was to bring this note, thus received by Clawson, and which was partnership property, into the settlement of the partnership accounts. So considered, the allegation was consistent with the general scope, and purposes of the bill, and relieved it from the objection which would otherwise have been fatal to it; and in the settlement of the accounts, it has been charged to Clawson, as so much of the partnership effects, received by him. The complainant cannot now be permitted to say, that he has been deprived of the benefit of his contract with Clawson, when he has voluntarily, by his own act, waived all right to it, by thus charging him, with the note, as so much of the partnership property in his hands, to be accounted for.

It is also proper to remark, that it was not competent for two of the partners, thus to deal with the partnership funds, to the prejudice of the other partners; and if the object of the

bill had been, to claim the lands thus purchased, with the partnership money, as partnership property, a very different question would be presented. That however, was not the purpose of the bill, and the other partners appear to have waived their right to the land, and to be content with requiring Clawson to account for the money.

The Tallapoosa lands, stand in the same predicament with the rest, being purchased during the continuance of the partnership. If it were true that the other partners refused to advance money for their purchase, a fact which does not appear, it would not, as already observed, dissolve the partnership. We are not able to discover any error in the decree of the Chancellor, and it must therefore be affirmed.